UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re:

      HEIDI LEA POWERS,                       Chapter 13

                            *Debtor.*        Case No.: 13-60976

_____

APPEARANCES:

HISCOCK & BARCLAY, LLP                  J. ERIC CHARLTON, ESQ.
*Attorney for Creditors*
300 South State Street
Syracuse, NY 13212

DAVID J. GRUENEWALD              DAVID J. GRUENEWALD, ESQ.
*Attorney for Debtor*
P.O. Box 69
Manlius, NY 13104

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

     This contested matter is before the Court for decision following an evidentiary hearing on

an objection to confirmation of the Third Amended Plan filed by Heidi Lea Powers ("Debtor").

The objection is based on Debtor's alleged lack of good faith in proposing a Chapter 13 plan and

in filing her bankruptcy petition, as well as her alleged failure to contribute all of her projected

disposable income to pay unsecured creditors.

     On June 3, 2013, Debtor filed a voluntary petition for relief under the provisions of Chapter

7 of the United States Bankruptcy Code (the "Chapter 7 Petition," ECF No. 1).[1]  On July 31, 2013,

William G. Powers, Jr. and Lisa Powers (collectively, "Creditors") filed an adversary complaint

---

[1] Debtor was represented by Nicholas Fodor, Esq. at the time of filing her chapter 7 petition.  On August 26, 2013, David J. Gruenewald, Esq. was substituted as attorney of record for Debtor, terminating Nicholas E. Fodor, Esq. as Debtor's attorney.  (ECF No. 78.)

objecting to Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (4)(A)[2] on the grounds that Debtor failed to disclose certain jewelry on Schedule B, provided false answers in her Statement of Financial Affairs, and knowingly and fraudulently transferred, removed, or concealed property within one year before the date of filing the petition with intent to hinder, delay, and defraud creditors or an officer of the estate. (ECF No. 17.)  On August 22, 2013, Creditors timely filed a proof of claim, Claim No. 4-1, asserting an unsecured debt of $137,388.43 ("Creditors' Claim"), pursuant to the terms of a Promissory Note dated November 1, 2007, in the face amount of $131,250.00.  Debtor and Creditors, related by marriage, once had a familial relationship.[3]

On March 17, 2014, Debtor converted her case to one under Chapter 13.  (The "Chapter 13 Petition," ECF No. 33.)  On March 24, 2014, Debtor filed a Chapter 13 Plan (ECF No. 36), to which Creditors objected on May 15, 2014.  (ECF No. 46.)  Debtor's Plan proposed a plan base of $12,000.00 to be paid over forty months.  Confirmation was originally set for June 17, 2014, but was twice adjourned without hearing until August 19, 2014.

On August 4, 2014, prior to the confirmation hearing, Creditors filed a Motion to Compel Disclosure.  (ECF No. 50.)  Shortly thereafter, on August 7, 2014, Debtor filed amended schedules (ECF No. 54) and the First Amended Plan (ECF No. 55), which also proposed a plan base of $12,000.00 to be paid over forty months, but contemplated the sale of Debtor's residence.  The Court held a hearing on August 19, 2014, wherein Creditors withdrew the Motion to Compel.  The Court thereafter issued a Scheduling Order, setting an evidentiary hearing on Creditors' objection to confirmation for October 8, 2014.  (ECF No. 63.)

---

[2] 11 U.S.C. §§ 101–1532 (2012) (the "Bankruptcy Code"). Unless otherwise indicated, all further section references are to the Bankruptcy Code.
[3] William Powers, Jr. is the brother of Michael B. Powers, Debtor's ex-spouse, and Lisa Powers is William's wife.

On August 22, 2014, Debtor filed a Motion to Sell Property located at 411 Morris Street in Ogdensburg, New York, which was to result in net proceeds of approximately $8,530.00, for which Debtor reserved a homestead exemption up to $10,000.00. (ECF No. 59.)  The First Amended Plan provided that if a new residence was not purchased within one year, $10,000.00 in proceeds would be paid into Debtor's plan.  Shortly thereafter, on September 22, 2014, Debtor filed a Second Amended Plan, which proposed a plan base of $12,000.00 to be paid over forty months, plus an estimated $5,000.00 in proceeds from the sale of the residence.  (ECF No. 73.)

On September 26, 2014, Creditors filed an objection to confirmation of Debtor's Second Amended Plan (ECF No. 75), for which an evidentiary hearing was scheduled on November 8, 2014.  One day prior to the scheduled hearing, on November 7, 2014, Debtor filed an objection to Creditors' Claim, seeking to modify or expunge the same, asserting an affirmative defense of duress. ("Debtor's Objection," ECF No. 85.)  In light of Debtor's Objection, the Court adjourned the evidentiary confirmation hearing until January 29, 2015.   The Court held a hearing on the Debtor's Objection on December 9, 2014, and continued on January 13, 2015, on which date it was overruled and Creditors' Claim was allowed in the full amount of $137,388.42 (ECF No. 103).

The Court held an evidentiary confirmation hearing on January 29, 2015, and continued the same on March 3, 2015.  One day prior to the continued hearing, on March 2, 2015, Debtor filed a Third Amended Plan, which proposed a plan base of $18,000.00 to be paid over sixty months, and approximately $5,000.00 in plus proceeds, which had been turned over to the Chapter 13 trustee from the sale of the residence previously.  (ECF No. 108.)  On the March 3, 2015 hearing date, the Court reserved decision on Creditors' objection to confirmation and requested additional briefing in lieu of closing arguments.

On April 24, 2015, Debtor and Creditors each filed memoranda in support of their respective positions with respect to confirmation of Debtor's Third Amended Plan filed on March 2, 2015.  (ECF Nos. 119 and 120, respectively.)  Debtor filed a Supplemental Memorandum of Law and Creditors filed a Reply Memorandum of Law on May 8, 2015 (ECF Nos. 122 and 123, respectively), on which date the matter was fully submitted and taken under advisement.  Upon consideration of the record, the parties' arguments, and the applicable authorities, the Court sustains Creditors' objection to confirmation and denies confirmation of Debtor's Third Amended Plan for the reasons stated herein.  This decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, to the extent made applicable to this matter by Federal Rule of Bankruptcy Procedure 9014(c).

## JURISDICTION

The Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(1).  This matter constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (L).

## BACKGROUND

The operative facts are drawn from the exhibits in evidence, the proceedings to date in this case, and the parties' Joint Stipulation of Facts (ECF No. 78).

As stated *supra,* Creditors' objection to confirmation is premised on the proposed treatment of their timely filed claim by Debtor's Third Amended Plan.  Creditors' Claim is based on a promissory note dated November 1, 2007, in the face amount of $131,250.00 (the "Note"), executed by Debtor and her then-spouse, Michael Powers, the brother of Creditor William G. Powers.  (ECF No. 90.)  The purpose of the Note was to allow Debtor and Michael Powers to consolidate and/or pay off a substantial amount of their marital debt.  (ECF No. 90.)  Between

December 2007 and April 2010, Debtor and Michael Powers, who are jointly and severally liable on the Note, made a total of twenty-nine payments by check, twenty-six of which were signed by Debtor.  (ECF No. 90.)  A principal balance of $115,200.00, plus $22,188.42 in pre-petition interest, attorney's fees, and costs, remains unpaid.  (ECF No. 90.)  Neither Debtor nor Michael Powers have made additional payments on the Note since April 2010 (ECF No. 120).

On April 27, 2011, Debtor commenced an action for divorce from Michael Powers in New York State Supreme Court, Lawrence County (the "State Court"), and the State Court issued a Judgment of Divorce on December 23, 2011.  (ECF No. 78.)  The Judgment of Divorce incorporates a Stipulation of Settlement, which, *inter alia,* provides Debtor with primary custody of all four of her and Michael Powers' children and an award of child support, but which allows Debtor and Michael Powers to each claim two of the four children as exemptions on their respective federal and state income tax returns.  (ECF No. 78.)  In connection with the divorce, Debtor also received title to the family's residence located at 411 Morris Street in Ogdensburg, New York (the "Morris Street Property").  (ECF No. 78.)  Since the divorce has been finalized, Debtor and Michael Powers have been in and out of family court on an ongoing basis.  (January 29, 2015 Trial Transcript 6, 24-25, 107, 131; March 3, 2015 Trial Transcript 101.)[4,5]

Debtor filed a Chapter 7 Petition on June 23, 2013 (the "Petition Date")[6] through her attorney at the time, Nicholas Fodor, Esq.  According to Schedule F, Debtor's unsecured debt as of the Petition Date totaled $146,620.00, of which $131,250.00 is owed to Creditors pursuant to

---

[4] As described *supra,* the Court held an evidentiary hearing on January 29, 2015, and continued on March 3, 2015. The transcript of the January 29, 2015 hearing will be hereinafter referred to as Trial Transcript I ("Trial Tr. I") and the transcript of the March 3, 2015 hearing will be hereinafter referred to as Trial Transcript II ("Trial Tr. II").

[5] In response to questioning by Debtor's counsel, Creditor William G. Powers testified that he has provided financial assistance to his younger brother, Michael Powers, with respect to the attorneys' fees incurred as a result of the ongoing family court matters.  (Trial Tr. II 100-01.)

[6] Debtor filed an Amended Voluntary Petition cover sheet on June 3, 2015 (ECF No. 7), to account for payment of the filing fee as required by § 109.

the Note.  Creditors therefore hold the largest claim in the case, which constitutes over 91% of the

filed unsecured claims.  Schedule D evidences secured debt in the total amount of $52,634.23 for

a Toyota Sienna van and for the Morris Street Property, where Debtor and her four children resided

at the time of filing.    Schedule D lists a value of $20,315.15 for the Toyota Sienna, with an

outstanding balance of $10,631.00,[7] and $68,640.00 for the Morris Street Property, encumbered

by a mortgage in the amount of $42,003.23.[8]  Debtor's Statement of Intention indicates that both

would be retained.  The Toyota Sienna van was paid off in July 2015.  Debtor has since sold the

Morris Street Property, as authorized by this Court on September 25, 2014, pursuant to a sales

contract for $49,500.00.  (ECF No. 74.)

Debtor is a third grade teacher with a bachelor's degree from Utica College and a Master's

degree in special education from Syracuse University.  (Trial Tr. I 15-16.)  She has been employed

by Ogdensburg Central School District ("OCSD") for eighteen years and is a member of the

Ogdensburg Education Association Instructional Unit ("OEAIU").  (ECF No. 78.)  In connection

with her employment, Debtor entered into four separate agreements with the Superintendent of

OCSD and the OEAIU, each of which set Debtor's salary within a fixed time frame (individually,

the "Employment Agreement," or collectively, the "Employment Agreements").  (ECF No. 78.)

According to the Employment Agreement dated January 27, 2011, effective at the time of filing,

Debtor's annual salary for the period beginning on the day after the last Friday of August 2012 to

the last Friday in August 2013 was $63,295.00.  (ECF No. 78.)  According to each of the

subsequent three Employment Agreements dated February 12, 2014, Debtor's annual salary for

---

[7] The Court takes judicial notice of its own docket pursuant to Federal Rule of Evidence 201 and notes that Ed-Med Federal Credit Union financed the loan for the Toyota Sienna van, and filed a proof of claim in the amount of $6,523.46.
[8] The Court takes judicial notice of its own docket pursuant to Federal Rule of Evidence 201 and notes that North Country Savings Bank was the mortgage lender on the Morris Street Property, and filed a proof of claim in the amount of $40,612.25.

the period beginning the day after the last Friday of August 2013 to the last Friday in August 2017, was $78,816.00.  (ECF No. 78.)  Thus, while Debtor's salary was $63,295.00 at the time of filing on June 23, 2013, she has consistently earned a gross annual salary of $78,816.00 since September of 2013, or prior to conversion of Debtor's case to one under Chapter 13.

According to Debtor's original Schedule I, Debtor was receiving net compensation in the amount of $3,462.57 per month plus child support in the amount of $2,150.90 per month, for an average monthly net income of $5,613.47 as of the Petition Date.  According to her original Schedule J, Debtor's monthly expenses were $6,374.00, resulting in a net monthly loss of $760.53.  With respect to said income and expenses, Paragraph 17 of Schedule I and Paragraph 19 of Schedule J, respectively, clearly stated that "debtor [did] not anticipate any increases or decreases." Debtor did not file an amended Schedule I to reflect the anticipated increase in salary pursuant to the Employment Agreements until September 4, 2013.  (ECF No. 28.)  Thereafter and over a sixteen month period, Debtor made numerous amendments to her schedules, specifically, to Schedules I and J, which the Court summarizes and describes herein:

| Date | Docket No. | Schedule I Net Monthly Compensation (Including Child Support ("CS")) | Additional Monthly Income | Average Monthly Income | Schedule J Net Monthly Expenses | Net Income |
|---|---|---|---|---|---|---|
| CH. 7 PETITION | 1 | $3,462.57 + $2,150.90 CS | | $5,613.46 | $6,374.00 | ($760.53) |
| 9/4/13 | 28 | " Amended to identify anticipated salary increase | | " | " | " |
| 3/25/14 | 34 | $4,069.00 + $2,150.90 CS | | $6,219.90 | $6,319.00 | ($99.10) |
| 8/7/14 | 54 | $4,538.00 + $2,150.90 CS | Yes | $6,688.90 | $6,597.00 | $91.90 |

| 9/22/14 | 72 | $4,538.00 + $$2,150.90 CS | $456.10 Parental Contribution | $7,145.00 | $6,845.00 | $300.00 |
|---------|-----|---------------------------|-------------------------------|-----------|-----------|---------|
| 1/28/15 | 104 | $4,650.00 + $2,137.00 CS | $471.00 Parental Contribution | $7,258.00 | $6,981.00 | $277.00 |

On March 25, 2014, Debtor filed a second amended Schedule I and first amended Schedule J. (ECF No. 34.) Debtor's second amended Schedule I reflected net compensation of $4,069.00 per month plus child support in the amount of $2,150.90 per month, for an average monthly income of $6,219.90. Her amended Schedule J reflected monthly expenses of $6,319.00, resulting in a net monthly loss of $99.10. Paragraph 24 of Debtor's amended Schedule J identified an anticipated increase in expenses and indicated that three of her children required braces at a cost of $2,500.00 per child, the Morris Street Property required repairs totaling $42,000.00 pursuant to a 2010 estimate, and that Debtor was responsible for ongoing attorney fees in connection with a dispute with her ex-husband in family court.

On August 7, 2014, Debtor filed a third amended Schedule I and a second amended Schedule J. (ECF No. 54.) Her third amended Schedule I reflected net compensation of $4,538.00 per month plus child support in the amount of $2,150.90, for an average monthly income of $6,688.90. Paragraph 13 of the same indicated that Debtor had amended her exemptions to receive more net income and that she intended to seek increased child support from her ex-husband. Debtor further indicated that she received $282.00 in additional income during the summer months when she was not required to pay health insurance costs and union dues, and that she had received $713.00 in compensation from a math training summer camp. Paragraph 13 also indicated that Debtor received financial assistance from her parents "when she realize[d] a shortfall in income." Second amended Schedule J reflected monthly expenses of $6,597.00, for a net monthly income

of $91.90. Paragraph 24 of third amended Schedule J indicated that Debtor anticipated an additional increase in expenses due to a change in custody, after which time the children would spend less time with Michael Powers in his home.  Debtor also identified a potential change in expenses due to the prospective sale of the Morris Street Property and rental costs of a prospective new residence, a prospective change in her insurance policies, and a down payment of $2,625.00 and monthly fees of $345.00 for braces for three of her four children.

On September 22, 2014, Debtor filed a fourth amended Schedule I and third amended Schedule J. (ECF No. 72.)  Debtor's fourth amended Schedule I, like her third amended Schedule I, reflected net compensation in the amount of $4,538.00 per month plus child support in the amount of $2,150.90 per month, but identified a temporary contribution from Debtor's parents in the amount of $456.10 per month, for an average monthly income of $7,145.00.   Debtor's third amended Schedule J reflected increased net expenses in the amount of $6,845.00, resulting in net monthly income of $300.00, rather than the previous $91.90.  Debtor identified an anticipated increase in expenses due to the following: (1) the change in the custody arrangement with her ex-husband; (2) the associated costs of food; (3) the anticipated sale or surrender of the Morris Street Property and the rental costs of a new residence which Debtor and her children had moved into;[9] (4) the associated cost of renter's and automobile insurance; (5) a reduced contribution from Debtor's parents upon the final payment on the Toyota Sienna van in July 2015; and (5) the down payment of $2,625.00 and monthly fees of $345.00 for braces for three of the four children.

On January 28, 2015, Debtor filed a fifth amended Schedule I and fourth amended Schedule J to reflect additional changes in income and expenses.  (ECF No. 104.)  Debtor's fifth amended Schedule I reflected increased net compensation in the amount of $4,650.00 per month,

---

[9] On August 22, 2014, Debtor filed a Motion to Sell the Morris Street Property (ECF No. 59).

plus decreased child support in the amount of $2,137.00 per month, plus an increased temporary contribution from Debtor's parents in the amount of $471.00, for an average monthly income of $7,258.00.    Debtor's fourth amended Schedule J reflected increased expenses in the amount of $6,981.00, resulting in a reduced net monthly income of $277.00, rather than the previous $300.00. Paragraph 24 of the same indicated that Debtor further anticipated an increase in expenses due to a $65.00 monthly fee for Debtor's counseling, which would resume in April 2015 and an additional $155 monthly fee for braces for the fourth child in February 2015.[10]

The record reveals that during the course of her bankruptcy, Debtor received state and federal income tax refunds in 2013 and 2014, both of which she testified she "turned [] into cash" and held in her home.  (Trial Tr. I 59-62.)  Although Debtor did not timely identify the receipt of same in her numerous amendments to her schedules,[11] she explained that the tax refunds are a "significant source of income in her household for things that need to be done" (Trial Tr. I 61), including payment of the mortgage,[12] the phone, cable, food, legal and other miscellaneous bills. (Trial Tr. II 6.)  Notably, Debtor testified that, on April 22, 2013, she received a federal income tax refund of $7,388.00 and a New York State income tax refund of $1,213.00 on April 25, 2013. (Trial Tr. I 106.)  Although Debtor filed the Chapter 7 Petition thirty-nine days later, on June 3, 2013, wherein she did not acknowledge receipt of same but later testified that she had expended such monies over a six week period prior to the filing of the petition for which she later claimed the "wild card exemption."[13]  Debtor also testified that she received a federal income tax refund

---

[10] Debtor testified that the expense for braces is $115.00 per month for each child.  (Trial Tr. I 126.)

[11] Debtor's amended Schedule B, filed on August 7, 2014, paradoxically identified an "*anticipated 2013 tax refund* of about $8,500.00. *Tax refund was received* and will be protected with wild card exemption." (ECF No. 54) (emphasis added).

[12] The Court notes that, pursuant to an Order Granting Debtor's Motion to Sell issued on September 25, 2014 (ECF No. 74), Debtor sold the mortgaged premises on or about October of 2014.  (Trial Tr. II 18.)  Debtor entered into a lease for a rental property, as discussed *infra,* on or about August 1, 2014.

[13] Debtor testified that she spent $8,601.00 in cash between April 25, 2013, the date Debtor received the total of her 2013 income tax refunds, and June 3, 2013, the date she filed the Chapter 7 Petition.  (Trial Tr. I 108.)

of $8,136.00 on April 21, 2014, and a New York State income tax refund of $1,203.00 on April

24, 2014. (Trial Tr. I 111-12.)  On April 25, 2014, about five weeks after converting her case to

Chapter 13, Debtor made a cash withdrawal of $9,500.00.  (Trial Tr. I 112.)[14]  When questioned

about the whereabouts of the cash, Debtor testified that she used the tax refunds for expenses and

for the down payment for her children's braces.  (Trial Tr. I 113.)  Creditors' counsel noted,

however, that in Debtor's application to the Chapter 13 trustee to incur non-emergency debt for

the children's braces (the "Debt Application"), she identified her parents as the source of the down

payment for the children's braces. (Trial Tr. I 114-15; Plaintiff's Ex. SS.)  In response, Debtor

testified that she "gave [the cash] to [her parents] to give to the orthodontist[]."  (Trial Tr. I 115.)

With regard to the braces, although Debtor testified that she made an appointment to have

the braces put on three of her four children on May 8, 2014 (Trial Tr. I 128; Trial Tr. II 22), Debtor

did not submit the Debt Application until August 13, 2014.  Upon receiving verbal approval from

the Chapter 13 trustee, the orthodontist put braces on Debtor's son the next day.  While the Debt

Application provides that "Debtor(s) [would] be responsible for payments OUTSIDE the Chapter

13 plan" and that "these payments [would] not be included in the bankruptcy" (ECF No. 120),

Debtor's second amended Schedule J nonetheless included a line item expense of $345.00 for an

"anticipated braces expense," in addition to Paragraph 24, which further identified the $2,625.00

down payment for the same.  Moreover, Debtor testified that she was not personally obligated for

the orthodontic debt where her parents signed the agreement (Trial Tr. I 128-29).

---

[14] As described *supra,* Debtor did not amend her Schedule B to acknowledge receipt of "an anticipated 2013 tax
refund" of approximately $8,500.00 until August 7, 2014. (ECF No. 54.) When specifically asked whether the August
7, 2014 amendment refers to the refund Debtor "received in April of 2013, [rather than] the refund that [she] received
in April 2014," Debtor responded, "I don't know." (Trial Tr. I 106.)  When presented with bank statements reflecting
the April 2013 deposit of $8,601.00, the combined amounts of Debtor's 2013 federal and state income tax refunds,
and the subsequent withdrawal, Debtor simply acknowledged receipt of the "anticipated refund" by stating "if that's
what it says, yes." *Id.*

In addition to their contributions toward the children's braces, Debtor's parents regularly contribute to her household expenses, including the food budget (Trial Tr. I 18), the children's athletic expenses (Trial Tr. I 22-23), and transportation costs (Trial Tr. I 46). Although Debtor testified that her parents pay for these expenses, her amended schedules list several of these expenses as deductions in calculating and arriving at Debtor's monthly projected disposable income. (ECF No. 104.)

During the course of her bankruptcy, Debtor's housing expenses changed due to her execution of a month-to-month lease that was much costlier than her costs on her residence that she was awarded in connection with her divorce. According to a 2013 appraisal, the Morris Street Property, which consisted of three bedrooms and one and a half baths within 2,383 square feet, had a fair market value of $69,000.00. Notwithstanding the fact that the residence was 113 years old, the appraisal indicated that it "appear[ed] to be of fair quality and in average condition." (Plaintiff's Ex. NN.) As of the Petition Date, the Morris Street Property had an outstanding mortgage balance of $40,612.25, toward which Debtor made monthly payments of $285.00. At the time of filing, Debtor indicated that she intended to keep the Morris Street Property. Consistent with the same, she subsequently executed a reaffirmation agreement with regard to the mortgage debt. (Plaintiff's Ex. LLL.) Debtor, however, sold the Morris Street Property approximately one year later, on August 22, 2014, citing significant deterioration and a reduced property value in support of the underlying sale motion. (ECF No. 59.)

Although this Court did not approve the sale of the Morris Street Property until September 25, 2014, Debtor and her four children have resided at a rental property located at 6661 State Highway 37 in Ogdensburg, New York (the "Rental Property") since August 1, 2014. Notably, Debtor entered into a month-to-month lease for the Rental Property on that date, after applying to

the Chapter 13 trustee for permission to enter into to a twelve month lease only three days prior, on July 28, 2014.  The Chapter 13 trustee did not consent to the twelve month term, but authorized Debtor to enter into a month-to-month lease.  (Trial Tr. I 122-25; Plaintiffs' Ex. LL.)  In contrast to the Morris Street Property, the Rental Property, which consisted of three bedrooms and two bathrooms within 3,696 square feet, has a fair market value of $298,000.00.  (Plaintiffs' Ex. RR.)  A 2014 listing detail further describes the Rental Property as having oak, apple wood and cherry flooring, a sunroom with bamboo walls and ceiling, seventeen skylights, hand rubbed cherry kitchen cabinets, three or more fireplaces, a two car garage, an in-ground swimming pool, and a "stunning view of the St. Lawrence."  (Plaintiffs' Ex. RR.)   On August 1, 2014, Debtor became responsible for the monthly rental payment of $1,380.00.   On August 7, 2014, Debtor filed amended schedules to account for these payments and reported net disposable income of $91.90. (ECF No. 54.)

Although the former monthly mortgage payment on the Morris Street Property was $285.00 (ECF No. 1), her original and first amended Schedules J identified home maintenance costs in the respective amounts of $450.00 and $400.00 per month, respectively.  Debtor later testified at the evidentiary hearing that while she did not actually expend these monies for the maintenance, she anticipated these costs given the state of disrepair of the Morris Street Property and offered into evidence photographs depicting said deterioration and alleging certain health hazards associated with the same.  (Debtor's Exs. 27-33.)

In addition to the inconsistencies contained within the multiple amendments to Debtor's Schedule I, Debtor's Schedule B and Statement of Financial Affairs were also incomplete at the time of the filing of the petition.  Schedule B of her original Chapter 7 Petition identified Debtor's interest in certain checking and savings accounts, household goods, wearing apparel, a Nikon

camera, the Toyota Sienna van, her former spouse's and her own pensions, and her children's interest in their respective life insurance policies.  On July 8, 2013, at Debtor's § 341(a) Meeting of the Creditors, Debtor testified generally that she did not own any collectibles, art, coins or jewelry, etc.  (Plaintiffs' Ex. LLL.)  However, upon specific questioning by Creditors' counsel, Debtor acknowledged the transfer of a platinum, 1.8 carat Marquis Diamond ring (the "Diamond Ring") to her mother on her mother's birthday in May 2011 (Plaintiffs' Ex. LLL), less than one month after filing the divorce complaint, and one year prior to canceling the State Farm Insurance policy on the ring.  (Trial Tr. I 17, 88.)  Debtor further acknowledged that the Diamond Ring had been previously appraised at a value of approximately $10,500.00.  (Plaintiffs' Ex. LLL.)  Upon further questioning, Debtor also disclosed that she had physical possession of a sapphire and diamond anniversary band, a diamond and platinum cross, a gold chain, a gold anniversary band and a sapphire ring, all of which Debtor had previously identified in an affidavit in connection with her divorce.  (Plaintiffs' Ex. LLL.)  Debtor testified that, except for the Diamond Ring, most of this jewelry had been stolen and recovered by police.  Debtor testified that she received $8,200.00 for loss of the Diamond Ring in an insurance settlement and that she used some of these proceeds to purchase an $11,000.00 diamond without a setting. (Plaintiffs' Ex. LLL.)  At the conclusion of the § 341(a) Meeting of Creditors, the Chapter 7 trustee asked Debtor whether "there [was] anything else that was not listed on [her] schedule B that in hindsight maybe should have been listed[,]" to which Debtor responded, "no"  (Plaintiffs' Ex. LLL).

Approximately two months after Debtor's initial § 341 meeting of creditors and one month after commencement of Creditors' adversary proceeding, on September 4, 2013, Debtor filed, *inter alia,* an amended Schedule B, wherein she disclosed an interest in "misc. jewelry–bracelets, chains, costume charms, earrings," having a collective appraised value of $254.50.   A

corresponding amended Statement of Financial Affairs identified the transfer of "a ring" to her mother "more than 2 [two] years before the bankruptcy based on her recollection," but noted that "if [the transfer] was found to [have occurred] with[in] the 2 [two] year[] [lookback period], the appraised value is $1,250.00." (ECF No. 28.)   During the evidentiary hearing on Creditors' objection to confirmation, Debtor testified that she received the Diamond Ring from her grandmother for her twenty-fifth birthday in 1993.  Debtor further testified that in 1998, she filled out an application to State Farm Insurance for insurance coverage on the Diamond Ring in the amount of $9,500.00, based on an appraisal she had obtained several years prior.  (Trial Tr. I 79-80.)  In connection with Debtor's divorce from Michael Powers in April 2011, Debtor valued the Diamond Ring at $10,500.00 on her statement of net worth. (Trial Tr. I 81.)  Debtor also testified that in October 2011, Michael Powers was removed from the State Farm Insurance policy at Debtor's request. (Trial Tr. I 82.)   In June 2012, Debtor then canceled her State Farm Insurance policy (Plaintiffs' Ex. AAA), having purportedly gifted the Diamond Ring to her mother in May 2011.

## ARGUMENTS

Creditors assert three independent grounds for denial of confirmation pursuant to § 1325: (1) Debtor's lack of good faith in proposing a plan under § 1325(a)(3); (2) Debtor's lack of good faith in filing a petition under § 1325(a)(7); and (3) the Third Amended Plan's failure to contribute all of Debtor's projected disposable income to pay unsecured creditors under the "best efforts test" of § 1325(b)(1)(B).[15]

---

[15] Creditors withdrew their objection to confirmation pursuant to § 1325(a)(4) upon the filing of the Third Amended Plan on March 2, 2015, which, *inter alia,* extended the commitment period to sixty months and provided for the contribution of surplus proceeds from the sale of the Morris Street Property.  (ECF No. 120 at 3 n.6.)

Creditors' good faith objections, while restated in varying ways, essentially focus on Debtor's honest commitment to obtaining a fresh start.  Creditors blend the supporting arguments as to Debtor's good faith with respect to the filing of the plan and the filing of the petition, citing Debtors' conduct within her bankruptcy generally as grounds to deny confirmation of the Third Amended Plan.[16]

Specifically, Creditors allege that Debtor repeatedly ignored her obligations during the pendency of the Chapter 13 case and manipulated the bankruptcy process by delaying the filing of amendments to her schedules and the submission of an application to incur non-emergency debt for her children's braces and by failing to testify truthfully with regard to the same.  Creditors note that Debtor signed and filed an amended Schedule B on August 7, 2014, wherein she disclosed, for the first time, that she had received a 2013 tax refund four months earlier, in April of 2014, and that she intended to use a "wildcard exemption" with respect to those funds.  The following day, Debtor submitted her application to the Chapter 13 trustee to incur non-emergency debt for the children's braces.  Creditors contend that Debtor deliberately obscured the source of the funds used to make the down payment to the orthodontist, falsely swore that her parents were the source of the funds, and thereby misled the Chapter 13 trustee as to how the post-petition debt would be satisfied.

Creditors additionally argue that Debtor's listed expenses are unreliable, exaggerated, and were willfully increased during the plan confirmation process in such a way as to "use up" Debtor's projected monthly income and reduce the amounts available to unsecured creditors, further demonstrating her lack of good faith within the bankruptcy process.  Creditors cite the seemingly strategic amendments to Debtor's bankruptcy schedules in support of the same.

---

[16] Preliminarily, while Creditors argue that Debtor's failure to file a petition in good faith is grounds for dismissal of her case, Creditors' Memorandum of Law (ECF No. 20) focuses predominantly on denial of confirmation.

Creditors also contend that Debtor repeatedly made false oaths and concealed information related to her finances in connection with the filing of her Chapter 7 Petition, schedules and statement of financial affairs, after willfully obscuring the timing of the purported gift of the Diamond Ring to her mother and by failing to disclose the existence of jewelry and other items.

In their post-hearing Memorandum of Law filed on April 24, 2016 (ECF No. 120), Creditors ask the Court, upon sustaining their objections to confirmation of Debtor's Third Amended Plan under § 1325(a)(3) or § 1325(a)(7), to dismiss Debtor's bankruptcy case. In this vein, Creditors contend that if the Court were to find that Debtor lacked good faith in the filing of either her Third Amended Plan or her petition, it should also find that such lack of good faith as fatal to any other plan that could be proposed, in keeping with certain sister courts of this Court. *See, e.g., In re Henri v. Wheeler (In re Wheeler)*, 511 B.R. 240 (Bankr. N.D.N.Y. 2014).

With respect to Debtor's disposable income, Creditors assert that the Court cannot confirm the Third Amended Plan because it fails to meet the requirements of § 1325(b)(1)(B)[17] where it does not account for or provide for payment to the Chapter 13 trustee of all of Debtor's projected disposable income during the applicable commitment period. While Debtor was a below median debtor as of the Petition Date, Creditors note that Debtor's salary increased substantially by the date of her conversion to Chapter 13, and argue that this increase in Debtor's salary pursuant to the Employment Agreements was both known and virtually certain as of the Petition Date. Although Debtor's Third Amended Plan, filed one day before the continued evidentiary confirmation hearing date, accounts for this increase in Debtor's income, Creditors preserve the argument to the extent Debtor does not concede the same. Creditors maintain, however, that

---

[17]   Creditors also object to the Third Amended Plan on the grounds that it improperly proposes to channel funds to administrative creditors in violation of the confirmation standard set forth in § 1325(b)(1)(B). (ECF No. 120.) However, the Court need not consider this argument where Creditors did not pursue the same.

Debtor's Form 22C[18] materially understates her projected disposable income absent inclusion of federal and state income tax refunds in excess of $1,500.00.

Creditors additionally argue that Debtor's expenses are not "reasonable and necessary" within the meaning of § 1325(b)(2), which defines such expenses as those which are "sufficient to sustain basic needs [regardless of the debtor's] former status in society or the lifestyle to which he is accustomed . . . ."  In particular, Creditors allege that the month-to-month lease for a purportedly luxurious Rental Property added a significant monthly expense during the pendency of Debtor's bankruptcy.   They contend that this undertaking demonstrates Debtor's disregard for her obligations as a debtor and the quid pro quo associated with bankruptcy protection.   In support thereof, Creditors cite *In re Kitson,* 65 B.R. 615 (Bankr. E.D.N.C. 1986), for the proposition that a "debtor who proposes to pay his creditors [] cents on the dollar cannot expect to go 'first class' when 'coach' is available."  *Id.* at 621-22; *In re Loper,* 367 B.R. 660, 665 (Bankr. D. Colo. 2007) (holding that a plan should not be confirmed "whenever debtors include in their budgets expenditures for luxury items, or excessive expenditures for non-luxury items.").

Creditors contend that Debtor's expenses should be determined in accordance with § 707(b)(2)(A) and (B), notwithstanding the statute's express application only to above median income debtors pursuant § 1325(b)(3).   Rather, Creditors argue that the Court has discretion to adjust expenses under *Hamilton v. Lanning,* 560 U.S. 505, 524 (2010), wherein the Supreme Court held that income can be adjusted based on changes that are known or virtually certain as part of the Court's projection of disposable income.   Accordingly, Creditors assert that § 707(b)(2) standards should apply to Debtor, either strictly, because she was an above median income debtor as of the date of conversion, or as a cap or guide, where it would be unfair to creditors to confirm

---

[18] Official Form 22C, commonly referred to as the "means test form," is titled "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income."

a plan in which a below median income debtor is allowed to deduct from income a higher expense amount than an above median income debtor.  (ECF No. 120.)  In either respect, Creditors note that under § 1325(b)(3) and the National and Local Standards for expenses calculated in Official Form 22C, the total annual expense amount reasonably necessary to be expended to support a household of five[19] is $73,704.00, and the total annual expense amount reasonably necessary to be expended to support a household of one is $49,476.00.  Creditors argue that the difference between these figures, $24,228.00, represents the annual expenses reasonably necessary to be expended for Debtor's four child dependents.  Where Debtor receives child support payments in the amount of $25,812.00 per year, an amount sufficient to cover the incremental cost of adding four dependents to the household, Creditors look to the National and Local Standards for a household of one in determining whether Debtor's actual expenses are reasonable and necessary.  Creditors argue that where Debtor's current, annual salary is $78,816.00, and where Debtor's annual expenses should be $49,476.00 under the National and Local Standards, Debtor should have $29,340.00 per year, or $2,445.00 per month, in net disposable income, not including child support payments.  However, Creditors note that Debtor's annual household expenses are approximately $104,592.00, greatly in excess of the annual figure posed by the National and Local Standards.  According to Creditors, Debtor's expenses are excessive and are not reasonable and necessary, particularly where Debtor voluntarily submitted herself to the jurisdiction of this Court and the protections of Chapter 13. (ECF No. 123.)  In short, Creditors contend that the Court should deny confirmation because Debtor understates her projected disposable income and overstates her reasonable and necessary expenses.

---

[19] For purposes of their objection to confirmation, Creditors do not dispute that Debtor has four dependents in her household; rather, Creditors allege that, given the stated number of dependents and her receipt of child support, her expenses are not reasonable and necessary under the National and Local Standards (ECF No. 123).

In response, Debtor summarily asserts that her Chapter 7 Petition was filed in good faith, that the Diamond Ring was gifted to her mother more than two years before the Petition Date such that it is irrelevant to the current proceeding, and that the identified omissions on Debtor's original schedules were made under the advice of her then-counsel, Attorney Fodor.[20]  Debtor further contends that she converted from Chapter 7 to Chapter 13 to better manage her exemptions, and that her Third Amended Plan was proposed in good faith, as evidenced in part by her $5,000.00 contribution of otherwise exempt proceeds from the sale of the Morris Street Property under the Third Amended Plan.

With respect to disposable income, Debtor contends that the sole issue before this Court is whether § 707(b)(2)(A)(ii)(I) applies post-petition and argues that disposable income is determined as of the Petition Date.  Thus, Debtor contends that any request for an amended Form 22C evidencing Debtor's disposable income as of the date of conversion is unfounded.[21]

## DISCUSSION

In evaluating Creditors' objection to confirmation of Debtor's Third Amended Plan, the Court notes that

> [t]he burden of proof for an objection to confirmation of a Chapter 13 bankruptcy plan is a shifting one. The party objecting to confirmation bears the initial burden of presenting some evidence to support [its] position.  Once the objecting party satisfies this initial burden, the burden shifts to the debtor, who always holds the ultimate burden of proof in the matter, to prove by a preponderance of the evidence that the plan complies with the requirements of 11 U.S.C. § 1325.

---

[20] Attorney Fodor was deposed with regard to the cited omissions on Debtor's original schedules on February 27, 2014, in connection with Creditors' adversary proceeding against Debtor. (Plaintiffs' Ex. BBB.)

[21] The Court's review of the docket shows that Debtor filed the required Form 22C post-conversion on March 25, 2014 (ECF No. 34), which she improperly captioned as an "*Amended* Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income."  Creditors, therefore, suggested that Debtor be required to amend this original Form 22C.

*McKinney v. McKinney (In re McKinney),* 507 B.R. 534, 539 (Bankr. W.D. Pa. 2014) (internal

citations omitted).[22]    As a preliminary matter, the Court finds that, based on the record and the

evidence adduced at trial, Creditors have satisfied their initial burden.  The Court therefore focuses

on whether Debtor has sustained the shifted burden of demonstrating by a preponderance of the

evidence that she has proposed a reorganization plan in good faith, filed a bankruptcy petition in

good faith, and committed all of her projected disposable income for the applicable commitment

period for repayment of her unsecured debt.

## I.    Good Faith

In order to be confirmed, a proposed Chapter 13 plan must meet each of the requirements

of § 1325(a), including, *inter alia,* that (i) "the plan [be] proposed in good faith and not by any

means forbidden by law" and (ii) "the action of the debtor in filing the petition [be] in good faith."

11 U.S.C. §§ 1325(a)(3) and (7).

### A.    Section 1325(a)(3)

While "good faith" is not statutorily defined, courts have held that "[a] debtor acts in 'good

faith' when [he or] she demonstrates a 'sound and proper motive for seeking the protection of

Chapter 13.'"  *In re Wheeler*, 511 B.R. at 250 (citing *In re Johnson*, 428 B.R. 22, 24 (Bankr.

W.D.N.Y. 2010)).  However, the Court need only take evidence and make a factual determination

on the issue of a debtor's good faith where, as here, a party objects to a debtor's good faith in

proposing a plan.  FED. R. BANKR. P. 3015(f).  The Court makes this determination based on the

totality of the circumstances using the following factors:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
> (2) the debtor's employment history, ability to earn, and likelihood of future
> increases in income; (3) the duration of the plan; (4) the accuracy of the plan's
> statement of the debts, expenses and percentage repayment of unsecured debt, and

---

[22] At the evidentiary hearing, however, the parties stipulated to the presentation of evidence out of order in the interest
of efficiency, with Debtor's counsel first questioning Debtor.

whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged, and whether any such debt is potentially non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Code; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief and; (11) the burden which the plan's administration would place upon the Chapter 13 trustee.

*In re Corino*, 191 B.R. 283, 288 (Bankr. N.D.N.Y. 1995); *see In re Wrobel*, 533 B.R. 863, 868 (Bankr. W.D.N.Y. 2015) (no particular factor is determinative). The Court may also consider whether the debtor has manipulated the Code. *In re Corino,* 191 B.R. at 289 n.10 (citing *Educ. Assistance Corp. v. Zellner,* 827 F.2d 1222 (8th Cir. 1987)). Thus, "[t]he essence of the totality of circumstances test requires a determination of whether Debtor's conduct evinces a continuum of bad faith as it relates to the Chapter 13 Plan's proposal." *Id.* Here, the Court looks mainly to the first, second, third, fourth, and ninth *Corino* factors, with particular emphasis on the first and fourth factors.

Debtor's Third Amended Plan proposes monthly plan payments of $300.00 for a sixty-month term, despite the fact that she is a below median income debtor and therefore eligible for a shorter plan. Debtor also proposes a contribution of $5,000.00 of otherwise exempt proceeds from the sale of the Morris Street Property, resulting in a total $23,000.00 contribution toward repayment of her debts. Pursuant to the Employment Agreements, Debtor's multiple amendments to Schedule I reflect a steady income, which rivals that of an above median income debtor and suggests Debtor has the ability to successfully complete the plan and repay the identified percentage of debts.

However, having testified to receipt of federal and state tax refunds in the years 2013 and 2014, the Court notes that, despite the numerous amendments to her schedules, Debtor did not acknowledge receipt of her 2013 refund, which she described as an "anticipated 2013 tax refund"

of approximately $8,500.00, until August 7, 2014, for which she then amended her exemptions. When specifically asked whether the August 7, 2014 amendment to Schedule B referred to the refund Debtor "received in April of 2013, [rather than] the refund that [she] received in April 2014," Debtor responded, "I don't know."  When presented with bank statements reflecting the April 2013 deposit of $8,601.00, the combined amounts of Debtor's 2013 federal and state income tax refunds, and the subsequent withdrawal, Debtor simply acknowledged receipt of the "anticipated refund" by stating "if that's what it says, yes."  In addition, Debtor testified that her income tax refunds serve as a "significant source of income in her household for things that need to be done," including payment of the mortgage, phone, cable, food, legal and other miscellaneous bills.  Notably, Debtor's Third Amended Plan does not account for this "significant source of income," yet it accounts for a $405.00 monthly payment on Debtor's Toyota Sienna van, for which Debtor testified the final payment was due in July of 2015.  Although the discontinuation of this expense should have resulted in an increase to Debtor's projected disposable income of approximately $18,000.00 over the life of the plan, the Third Amended Plan does not provide for a corresponding increase in plan payments.  Thus, in the first instance, the Third Amended Plan appears to be significantly underfunded.

A review of the multiple amendments to Schedule J in conjunction with Debtor's testimony further reveals that the Third Amended Plan has not been adjusted for the various anticipated expenses which either were never realized or were paid for by someone other than Debtor, namely, her parents.  For example, Debtor's second amended Schedule J included a line item monthly expense of $345.00 for an "anticipated braces expense," in addition to Paragraph 24, which further identified the $2,625.00 down payment for the same.  However, while Debtor first identified her parents as the source of the down payment in her Debt Application, she later testified that she made

the down payment, notably, with the cash from an income tax refund, which she purportedly gave

to her parents to give to the orthodontist.  Moreover, Debtor testified that she was not personally

obligated for the orthodontic debt where her parents signed the agreement.  Yet, Paragraph 24 of

Debtor's subsequently filed, third amended Schedule J then identified an additional anticipated

braces expense of $115.00 per month beginning in January 2015 for her fourth child, which had

not been realized as of the January 29, 2015 hearing.  (Trial Tr. I 9.)  Paragraph 24 of the same

Schedule J further indicated that Debtors' parents provide financial assistance when Debtor

experiences a shortfall in income.  It is not clear from the record, however, whether this financial

assistance further supplements the monthly contribution of $456.10 already provided by her

parents and identified by line item 11 on Debtor's fourth amended Schedule I, which was filed on

the same date as the third amended Schedule J.  In addition, line item 21 of Debtor's third amended

Schedule J accounts for a $200.00 monthly expense for "sports for children (paid by

grandparents)."  To the extent Debtor does not actually pay for these monthly expenses from her

own funds as Schedule J suggests, her net monthly income should be increased by that amount as

well as by amounts for other anticipated expenses which presently do not exist or for which Debtor

is not responsible.

The Court finds equally problematic the facial inaccuracies of Debtor's collective

Schedules I and J.  Debtor's scheduling of household expenses lacks transparency and therefore

prevents the Court from determining Debtor's expenses with any precision where she presents a

constantly moving target.  *See In re Kressig,* No. 00-02247, 2000 Bankr. LEXIS 2065, at *12

(Bankr. N.D. Iowa Oct. 18, 2000).  The Court notes that with nearly every amended Schedule I

reflecting an increase in income, Debtor filed an amended Schedule J reflecting a corresponding

increase in expenses.[23]   While debtors may freely amend their schedules in the interest of candor with the Court, the nature and timing of Debtor's amendments to her schedules invite more questions than they answer.   This suggests that Debtor's expenses may in fact have been manipulated in such a way as to "use up" any increase in Debtor's projected disposable income.

To illustrate, Debtor's original and first amended Schedules J identify, respectively, a home maintenance expense in the amount of $450.00 per month and $400.00 per month.   However, Debtor testified at the evidentiary hearing that she did not actually expend these monies, but instead listed these anticipated costs given the state of disrepair of the Morris Street Property.   In addition, Debtor's original through fourth amended Schedules J identify, respectively, transportation expenses in the amount of $350.00 per month, $300.00 per month, $600.00 per month, $600.00 per month, and $494.00 per month, without explanation for this variation.   While the Court acknowledges that Debtor has four children, all of whom are involved in extracurricular activities, Debtor testified first that she and her parents "split transportation to the activities" and, second, that her "parents transport [her children] daily." (Trial Tr. I 46.)   In light of the same and given the swing in transportation expenses, the Court is unable to ascertain Debtor's actually monthly transportation expense.   To the extent Debtor's fourth amended Schedule J captures expenses borne by Debtor's parents, as discussed *supra,* it does not accurately reflect Debtor's actual monthly expenditures and should be amended accordingly.   Based on the foregoing examples alone, and notwithstanding that Debtor has proposed a sixty month plan term and contributed exempt funds, the Court finds that the first and fourth *Corino* factors weigh heavily against Debtor with respect to her proposal of the Third Amended Plan.

---

[23] Debtor's original Schedule J identifies expenses in the amount of $6,374.00.   The successive amendments to Schedule J identify expenses in the respective amounts of $6,319.00, $6,597.00, $6,845.00, and $6,981.00.

For the foregoing reasons, the Court finds that the Third Amended Plan has not been proposed in good faith as required by § 1325(a)(3).  Because this element of confirmation is not met confirmation can be denied on that basis alone.  However, given the fact that the parties have expended considerable time and resources to brief the merits of Creditors' § 1325(a)(7) ground for objection and because it is a matter of first impression for this Court, the Court will analyze the same here.

**B.      Section 1325(a)(7)**

Where § 1325(a)(3) requires good faith in the filing of the plan, § 1325(a)(7) requires good faith in the filing of the petition.  11 U.S.C. § 1325(a)(7).  Notwithstanding the passage of more than ten years since § 1325(a)(7)'s enactment as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), case law is sparse and no binding precedent exists to guide this Court in its analysis of this confirmation requirement.  As is true of many of BAPCPA's provisions, legislative history provides no insight into the congressional intent or purpose of § 1325(a)(7).

Like the analysis of § 1325(a)(3), courts generally agree that the good faith standard of § 1325(a)(7) is analyzed using a totality of the circumstances test.  While some courts have looked to and announced various multifactor tests emulating the § 1307(c) analysis set forth in *In re Love*, 957 F.2d 1350 (7th Cir. 1992), *see, e.g., In re Colston,* 539 B.R. 738, 750 (Bankr. W.D. Va. 2015) ("While limited guidance exists on what a debtor must prove to obtain confirmation under Section 1325(a)(7), the standards used in a Section 1307(c) good faith analysis are helpful."), the Fourth Circuit has suggested that courts conduct the same good faith analysis under § 1325(a)(7) as they do under § 1325(a)(3), *see, e.g., Bland v. Zigmont (In re Bland)*, No. 1:08CV130, 2009 U.S. Dist. LEXIS 17889, at *8 n.3 (N.D. W. Va. Mar. 4, 2009).  Rather than analyzing set factors under this

subsection, courts have generally considered "whether, under the circumstances of the case, there has been an abuse of the bankruptcy process." *In re Cole*, 548 B.R. 132, 150 (Bankr. E.D. Va. 2016) (citing cases).

For purposes of § 1325(a)(7), however, this Court does not favor the application of either the § 1325(a)(3) or § 1307(c) tests for the reason that these are three independent statutory provisions, and each section serves a separate and distinct purpose. Section 1325(a)(3) tests the reasonableness of the plan and the sincerity of the debtor with respect to that particular plan; § 1325(a)(7) tests whether the filing is fundamentally fair and in a manner that complies with the spirit of the Code; and § 1307(c) seeks, *inter alia*, to prevent dishonest, ill-motivated, bad faith debtors from invoking the protections of bankruptcy altogether. By its very terms, § 1325(a)(7) contemplates only whether the "action of the debtor in filing the petition was in good faith." 11 U.S.C. § 1325(a)(7). Because Congress purposefully added § 1325(a)(7) to the Code in 2005, in this Court's view, § 1325(a)(7) must serve a purpose different from either § 1325(a)(3) or § 1307(c). *See Henderson v. Wade (In re Wade)*, No. 15-66793, 2016 Bankr. LEXIS 739, at *12-13 (Bankr. N.D. Ga. Mar. 4, 2016) ("Because the good faith requirement of §1325(a)(7) was added to the Code in 2005 the analysis should not be identical to that undertaken under § 1325(a)(3).").

"The essential question before the Court [for purposes of § 1325(a)(7)] is whether the debtor filed the petition for a greedy and unworthy purpose as opposed to a rehabilitative purpose." *Id.* at *13 (internal citations and quotation marks omitted); *accord In re Furlong*, 426 B.R. 303, 310 (Bankr. C.D. Ill. 2010) ("The pertinent inquiry is whether there is a genuine need for bankruptcy relief and an ability to complete a Chapter 13 repayment plan."). To answer this question, the Court will look to traditional good faith factors most pertinent to Debtor's "action . . . in filing the petition," and her purpose for doing so. These factors include, but are not limited to,

the motivation of the debtor and his or her sincerity in seeking Chapter 13 relief, the debtor's degree of effort, the frequency with which the debtor has sought relief under the Code, and the circumstances under which the debtor has contracted his or her debts and has demonstrated good faith in dealing with creditors.  Here, the majority of these factors weigh in Debtor's favor.

Admittedly, Debtor may not be a model debtor and her credibility was questionable given her disingenuous and, at times, sarcastic testimony in response to Creditors' counsel's questions. However, the Court is cognizant of the fact that this bankruptcy case is defined by Debtor's ongoing matrimonial and familial dispute.  Creditors' Claim is the primary debt that precipitated Debtor's bankruptcy filing.  Given the circumstances of how Creditors' debt arose and the fact that Creditors now seek full satisfaction of the debt from Debtor alone, Debtor's reticence in dealing with Creditors and her unwillingness to satisfy this debt is understandable, although not condoned. Debtor should not be saddled with this debt into perpetuity and should be provided an opportunity to address her responsibilities in repaying it.  Further, not only has Debtor never sought bankruptcy protection prior to filing the instant case, she has proposed a plan term longer than that required of a below median debtor and contributed exempt funds.  Therefore, although Debtor's efforts to repay Creditors' Claim must be improved as discussed herein, based on the facts of this case, the Court finds that Debtor had a sound and proper purpose for seeking bankruptcy protection and her action in filing her petition was done in good faith as required by § 1325(a)(7).

Although the Court need not do so as a result of its finding in favor of Debtor under § 1325(a)(7), given the split in case law and Creditors' request to have Debtor's case dismissed under § 1325, the Court will address whether denial of confirmation or dismissal is the appropriate remedy under subsection (a)(7).  Section 1325(a)(7) is a frequently debated subsection among the plan confirmation requirements set forth in § 1325.  *See e.g., In re Manno*, No. 08-15588BF, 2009 Bankr.

LEXIS 142, at *22 n.9 (Bankr. E.D. Pa. Jan. 30, 2009) (discussing the confusion among courts

following the enactment of § 1325(a)(7) over its interaction with § 1307(c)); *see also In re Soppick,*

516 B.R. at 745 (same).[24]

Since its enactment, there has been significant disagreement among courts as to whether §

1325(a)(7) requires dismissal of a petition not filed in good faith, and thereby incorporates the

traditional § 1307(c) bad faith analysis, or whether § 1325(a)(7) and § 1307(c) are separate and

distinct inquiries, the former of which only requires that a court deny confirmation of a plan upon

a finding that the debtor's action of filing a petition was not done in good faith. *Compare In re*

*Torres Martinez*, 397 B.R. 158, 165 (B.A.P. 1st Cir. 2008) (implying that the obligation of a Chapter

13 debtor to commence a case in good faith now resides in § 1325(a)(7) rather than § 1307(c)), *and*

*In re Wheeler,* 511 B.R. at 252 ("In light of the fact that this court has found that the Debtor filed

her petition in bad faith, this finding is fatal to confirmation of any subsequent plan that the Debtor

could propose."), *and In re Manno*, No. 08-15588bf, 2009 Bankr. LEXIS 142, at *21-22 n.9 ("[I]f

a lack of good faith in filing a Chapter 13 petition mandates a denial of confirmation, it would

---

[24] Section 1307(c) provides:

> (c) Except as provided in subsection (f) of this section, on request of a
> party in interest or the United States trustee and after notice and a hearing, the
> court may convert a case under this chapter to a case under chapter 7 of this title,
> or may dismiss a case under this chapter, whichever is in the best interests of
> creditors and the estate, *for cause*, . . . .

11 U.S.C. § 1307(c) (emphasis added). "'[A]lthough 11 U.S.C. § 1307(c) does not expressly equate bad faith with
'cause,' the bankruptcy court can . . . dismiss the petition or convert the case under section 1307(c) if the debtor files
his petition in bad faith.'" *In re Wallace*, No. 14-10437 (ALG), 2014 Bankr. LEXIS 3142, at *11-12 (Bankr. S.D.N.Y.
July 24, 2014) (quoting *In re Eatman*, 182 B.R. 386, 392 (Bankr. S.D.N.Y. 1995)). "Bad faith has both an objective
and subjective element: the proponent of bad faith must show 'both objective evidence of a fundamentally unfair result
and subjective evidence that the debtor filed a petition for a fundamentally unfair purpose that was not in line with the
spirit of the Bankruptcy Code.'" *Id.* at *12 (quoting *In re Eatman*, 182 B.R. at 392) (internal quotation marks and
citation omitted). Dismissal for cause pursuant to § 1307(c) on the basis of bad faith is a narrow remedy reserved for
only egregious cases. *In re Lin*, 499 B.R. 430, 435 (Bankr. S.D.N.Y. 2013). In making a § 1307(c) bad faith dismissal
determination, courts consider factors including whether the debtor was forthcoming with the court, whether the debtor
accurately stated facts, debts, and expenses, whether the debtor misled the court through fraudulent misrepresentation,
how the debtor's actions affect creditors, and whether the debtor has abused the purpose of the Bankruptcy Code. *Id.*
at 436 (citing *In re Klevorn*, 181 B.R. 8, 11 (Bankr. N.D.N.Y. 1995)).

appear that this defect would be irremediable. If so, a Chapter 13 case in which the debtor is unable to confirm any plan warrants dismissal under section 1307(c)."), *and In re Trainor,* No. 13-09818, 2014 Bankr. LEXIS 5109, at *7-8 (Bankr. S.D. Ind. Dec. 22, 2014) (explaining that § 1325(a)(7) appears to be the codification of pre-BAPCPA judge-made rule from the earlier version of § 1307(c)—dismissal "for cause" where a petition was not filed in good faith), *with In re McDonald,* 508 B.R. 187 (Bankr. D. Colo. 2014) ("The addition of § 1325(a)(7) by BAPCPA lends further support for the view that a more stringent test should be applied under § 1307(c). Under § 1325(a)(7), courts have authority to take the less drastic step of denying confirmation of a Chapter 13 plan if the petition is not filed in good faith, rather than dismissing the case."), *with In re Trainor,* No. 13-09818, 2014 Bankr. LEXIS 5109, at *9 (Bankr. S.D. Ind. Dec. 22, 2014) ("[B]ecause dismissal is harsh we agree that the bankruptcy court should be more reluctant to dismiss a petition under Section 1307(c) for lack of good faith than to reject a plan for lack of good faith under Section 1325(a)[(7)])." (quoting *In re Love*, 957 F.2d 1350, 1356 (7th Cir. 1992)); *and In re Hall,* 346 B.R. 420, 426 (Bankr. W.D. Ky. 2006) ("It, therefore, appears that the insertion of § 1325(a)(7) is meant to provide courts with an alternative to the harsh dismissal called for under § 1307(c) if the court finds that a petition was not filed in good faith."), *and In re Gonzalez,* No. 08-15277, 2008 Bankr. LEXIS 3751, at *6 (Bankr. E.D. Cal. Nov. 25, 2008) ("Pursuant to §1325(a)(3), the Debtor cannot confirm a Chapter 13 plan not filed in good faith.  In addition, the Debtor cannot confirm a plan unless the petition itself is filed in good faith. [11 U.S.C.] §1325(a)(7). A case can be dismissed if the petition was not filed in good faith. [11 U.S.C.] § 1307(c).").

This Court agrees with the leading bankruptcy treatise that because § 1325(a)(7) is a subsection of § 1325(a), and therefore arises solely in the context of confirmation, "Congress has presumably indicated that denial of confirmation, rather than dismissal, is the appropriate way to

prevent [the filing of a petition not in good faith]." 8-1325 COLLIER ON BANKRUPTCY ¶ 1325.08 (MB 2016).  Further, while the first line of cases cited above that hold otherwise do so under the theory that a debtor can never put forth a confirmable plan when his or her case filing was not done "in good faith," many of these courts use the terms "not in good faith" and "bad faith" interchangeably.  This Court recognizes that these terms are not synonymous but rather that there is a distinction between them.  "[A] finding that a case is not filed in 'in good faith' is different from finding the case was filed 'in bad faith.'"  *In re Beasley*, No. 11-40642, 2011 Bankr. LEXIS 3703, at *6 (Bankr. N.D. Ala. Sept. 27, 2011) (citing *In re Lavilla*, 425 B.R. 572 (Bankr. E.D. Cal. 2010) (discussing the distinction between a finding of 'bad faith' and a finding of 'not in good faith,' and also discussing the burden of proof for confirmation)).  As the court stated in *Lavilla*, "[t]he court can determine that a Chapter 13 petition is not filed in 'good faith' without having to find that the debtor is acting in 'bad faith' (dishonesty of belief or purpose)."  *In re Lavilla*, 425 B.R. at 576 (citation omitted).  While § 1325(a)(7) warrants denial of confirmation when "the action of the debtor in filing the petition is not in good faith," 11 U.S.C. § 1325(a)(7), § 1307(c) warrants conversion or dismissal "for cause" only in extraordinary situations where the creditor or record demonstrate "actual indicum of bad faith, not merely a lack of good faith," *In re Ladieu*, No. 14-10551, 2015 Bankr. LEXIS 1801, at *16 (Bankr. D. Vt. June 1, 2015) (citing *In re Edwards*, No. 03-10018, 2003 Bankr. LEXIS 2023, at *13 (Bankr. D. Vt. Aug. 26, 2003)).  "The potential for blurring the lines between the concepts of bad faith and a lack of good faith is significant, since both concepts play an important role in Chapter 13 cases.  However, it is critical to keep these two concepts distinct because they arise in different aspects of a case and the burden of proof differs depending on which concept is at issue."  *In re Edwards*, 2003 Bankr. LEXIS 2023, at *13 (Discussing and comparing § 1307(c) with § 1325 (a)(3)).  Accordingly, this Court aligns itself

with the second line of cases cited above and finds that § 1325(a)(7) provides no additional authority to dismiss a petition.

## II.    Dismissal Under § 1307(c)

Because Creditors have not moved for dismissal under § 1307(c) and the sole matter before the Court is confirmation of Debtor's Third Amended Plan pursuant to § 1325, the Court's consideration of dismissal pursuant to § 1307(c), if at all, would be a *sua sponte* exercise of the Court's powers.  *In re Zuckerman*, BAP No. MS 12-085, 2013 Bankr. LEXIS 1729, at *6 (B.A.P. 1st Cir. Apr. 24, 2013) ("The powers bestowed upon the court in § 105(a) include the equitable and discretionary power to dismiss a case *sua sponte* under § 1307(c)(1).").  Any such exercise of the Court's discretionary power, however, would require notice to all creditors.  8-1307 COLLIER ON BANKRUPTCY &1307.04.  While the Court ordinarily would refrain from explaining why it would decline in a particular instance to take *sua sponte* action, the Court makes an exception here given Creditors' request, albeit pursuant to § 1325, to dismiss Debtor's case.

Although the Court may, upon proper notice, dismiss a petition if it finds bad faith rising to the level of "cause" in the filing of the petition, *In re Rodriguez*, 487 B.R. 275, 282 (Bankr. D.N.M. 2013) ("After BAPCPA, bad faith filing remains a ground for dismissal under 11 U.S.C. § 1307(c)."), in making such a determination, the Court must heed the directives that dismissal under § 1307(c) "is reserved only for extraordinary circumstances" and, as recognized *supra*, "a court should be more reluctant to dismiss a case under § 1307 than to deny confirmation under § 1325," *In re Werden*, No. 99-11764, 2000 Bankr. LEXIS 1787, at *5 (citing *Cardillo v. Andover Bank (In re Cardillo)*, 169 B.R. 8, 10 (Bankr. D.N.H. 1994)) (internal citations omitted).

Given the equitable and discretionary nature of relief afforded under § 1307(c), the court declines to *sua sponte* notice and consider dismissal of Debtor's petition in light of Debtor and

Creditors' acrimonious familial history. The record clearly evidences a continued strained and tumultuous relationship between Debtor and Michael Powers, a relationship from which Creditors are not far removed. While the Court acknowledges that Creditors hold, by far, the largest claim in Debtor's bankruptcy, Debtor and Michael Powers are jointly and severally liable on the Note representing that debt.[25]   Nonetheless, Creditors have focused their collection efforts on Debtor alone, while openly acknowledging their munificent relationship with Michael Powers.[26] Creditors, the relatives of Debtor's ex-spouse, have gone to great lengths in opposing Debtor's bankruptcy.   The familial nature of this dispute therefore influences the Court and, absent additional evidence, tends to support a finding that Debtor is not abusing the provisions, purposes or spirit of bankruptcy law, but rather, attempting to claw away from her emotional and tumultuous past in the hopes of obtaining a fresh start.   As the record presently stands, the Court does not perceive Debtor as the type of individual for which bankruptcy relief and a fresh start should be out of reach.   Simply stated, Debtor is not the atypical debtor who has demonstrated that she is not entitled to the relief available to the typical debtor.

Rather, Chapter 13 relief is warranted on the present record if Debtor can propose a confirmable plan.   Accordingly, Debtor will be provided an opportunity to remain in bankruptcy and present a subsequent confirmable plan that satisfies the confirmation requirements of § 1325 and fits within the confines of the Bankruptcy Code.

---

[25] Notwithstanding that both Debtor and Michael Powers are obligated on the Note, it is Debtor's position, as advocated in her prior Objection, that the debt in question was incurred primarily by Michael Powers and, as such, she should not be saddled with its repayment.  Although the issue of liability could have been addressed in the Powers' divorce proceeding, it was not for reasons unknown to this Court and, as a result, precipitated Debtor's bankruptcy filing.

[26] Creditor William G. Powers testified, "but Michael's my little brother and he's my godson and he's a good friend and he was in need[.] [M]uch in the same way that Heidi's mother and father came to her aid[,] I came to Michael's [sic]." (Trial Tr. II 101.)

### III.    Disposable Income

Having now evaluated Debtor's good faith under §§ 1325(a)(3) and (a)(7) and having found a basis to deny confirmation for the reasons set forth therein, the Court will only briefly assess Debtor's disposable income under § 1325(b)(1)(B).   Given the nature of Creditors' arguments regarding Debtor's increased annual salary, the Court feels compelled to note the following at the outset.   While Creditors are troubled by the fact that Debtor, a below median income debtor, seeks to deduct from income a higher expense amount than that of an above median income debtor, there is no basis in law or in public policy to restrict below median income debtors to the same expenses authorized above median income debtors.   *In re Urquhart*, No. 09-71058, 2009 Bankr. LEXIS 3526, at *9 (Bankr. C.D. Ill. Nov. 12, 2009).   Rather, the law is clear that application of § 707(b)(2) is statutorily limited to above median income debtors—a status determined solely by reference to a debtor's CMI, which is statutorily defined as a backward-looking calculation.   11 U.S.C. § 101(10A). Thus, notwithstanding a post-petition increase in income pursuant to the Employment Agreements, because Debtor was a below median income debtor as of the Petition Date, the use of § 707(b)(2) to limit or cap Debtor's expenses is not appropriate.   Creditors' argument in support of the same is therefore without merit.   11 U.S.C. § 1325(b)(3); *In re Gladwin*, No. 10-62276-13, 2011 Bankr. LEXIS 489, at *8-9 (Bankr. D. Mont. Feb. 9, 2011) (holding that the application of § 707(b)(2) to a below median income debtor, even as a guide, would run counter to the holdings of *Lanning* and *Ransom*, which made clear that the means test does not apply to a below median income debtor); *In re Urquhart*, 2009 Bankr. LEXIS 3526, at *10.   While this Court acknowledges the unnatural result of this strict application, it also acknowledges that "Congress was free to limit § 1325(b)(3) to above-median income debtors, and inevitably such line drawing may result in a few peculiar results when different tests are employed

for the two different categories of debtors" but it did not do so.  *In re Briscoe*, 374 B.R. 1, 11

(Bankr. D.D.C. 2007); *In re Gladwin*, 2011 Bankr. LEXIS 489, at *8 (citing 11 U.S.C. § 1325(b)(2)

and (3) and holding that because the means test does not apply to Chapter 13 debtors whose

incomes are below the median, those debtors must prove on a case-by-case basis that each claimed

expense is reasonably necessary.)).

In light of the deferential nature of the disposable income analysis for a below median

income debtor, the Court need not provide Debtor with specific values of income and expenses on

which she should premise a future plan.  Even if it were so inclined, the Court would not be able

to do so in light of the manner in which Debtor has presented her financial picture.  This moving

target does not comport with the best effort test to repay creditors under § 1325(b) and has made

it impossible for the Court to have a clear understanding of what Debtor's true finances are.

Having set forth general parameters with respect to the same, the Court looks to Debtor and her

counsel to disclose her financial picture in a completely accurate and transparent manner and,

based on the same, to propose a plan demonstrating her best efforts to reorganize her debts should

she wish to remain in Chapter 13.

## CONCLUSION

Section 1325 sets forth the various requirements with which a Chapter 13 debtor's plan

must comply before it may be confirmed.  Having now applied the relevant tests under § 1325 to

the particular facts of this case, the Court denies confirmation of Debtor's Third Amended Plan,

and directs Debtor to file amended Schedules I and J and to propose a confirmable plan within the

confines set forth by this Memorandum-Decision and Order.

Accordingly, it is hereby

ORDERED, that Creditors' objection to confirmation pursuant to §§ 1325(a)(3) is sustained; and it is further

ORDERED, that Creditors' objection to confirmation pursuant to § 1325(a)(7) is overruled; and it is further

ORDERED, that Creditors' objection to confirmation pursuant to § 1325(b)(1)(B) is sustained; and it is further

ORDERED, that Debtor shall file a Fourth Amended Plan within 30 days of issuance of this Memorandum-Decision and Order or, upon her failure to do so, the Chapter 13 trustee is directed to submit an ex parte order dismissing her case.

IT IS SO ORDERED.


Dated: July 13, 2016
       Utica, New York

                                                    /s/Diane Davis_____
                                                    DIANE DAVIS
                                                    United States Bankruptcy Judge